

# NUMBER 13-09-00554-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

JOE RICHARD JASSO, **Appellant,**

**v.**

THE STATE OF TEXAS, **Appellee,**

**On appeal from the 156th District Court
of Bee County, Texas.**

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Benavides
Memorandum Opinion by Chief Justice Valdez**

Appellant, Joe Richard Jasso, was convicted of six counts of aggravated sexual assault, a first-degree felony, and pleaded guilty to one count of sexual assault, a second-degree felony. *See* TEX. PENAL CODE ANN. §§ 22.011(a)(2), (f), 22.021(a)(1)(B)(i), (2)(A)(ii), (e) (Vernon Supp. 2010). Jasso was sentenced to ninety-nine years' incarceration plus a $10,000 fine for each count of aggravated sexual assault and twenty years' incarceration plus a $10,000 fine for the sexual assault count.

The trial court ordered that the sentences for four of the aggravated sexual assault convictions (counts 1, 4, 8, and 9) be served concurrently after the completion of a prior sentence in an unrelated case and that the remaining convictions (counts 7, 10, and 11) be served consecutively upon the completion of the concurrent sentences in counts 1, 4, 8, and 9.[1] By six issues, Jasso contends that: (1) the evidence is legally and factually insufficient "to support the conclusion that appellant is the 'Joe Richard' the subject of the jury's verdict of guilt in counts [1 and 4]"; (2) the evidence is legally and factually insufficient "to support the jury's verdict of guilt regarding counts [1 and 4]"; (3) the trial court's cumulation of the sentences imposed for counts 7, 10, and 11 constitutes cruel and unusual punishment; and (4) the trial court erred in cumulating the sentences with a prior sentence. We affirm.

## I.    BACKGROUND

In this case, the State alleged that Jasso sexually assaulted three girls: A.L., S.K., and S.S. At the time of the alleged incidents, the girls were four, thirteen, and fourteen years old, respectively. The investigation into Jasso's involvement began when Leo Campos, the stepfather of A.L., wrote the Bee County District Attorney's Office (the "District Attorney's Office") describing a conversation he had with A.L. when she visited him in jail.[2] In several letters written to the District Attorney's Office, Campos

---

[1] The trial court ordered:

This sentence shall begin upon the completion of sentence in Bee County, Texas cause no. B-04-2061-CR-B. The sentences in Counts 1, 4, 8 & 9 shall run concurrently. The sentences in Counts 7, 10 & 11 shall run consecutively—with the sentence in Count 11 to begin upon the completion of the concurrent sentences in Counts 1, 4, 8 & 9. The sentence in Count 7 shall begin upon the completion of the sentence in Count 11. The sentences in Count 10 shall begin upon the completion of the sentence in Count 7 . . . .

[2] Campos is currently serving a thirty-five year prison sentence for what he described as "a cocaine charge."

stated that A.L. had told him that "Joe" had touched her private parts and that "Joe" told her that he would hurt her if she told anyone. At trial, Campos testified that when A.L. told him what had happened with "Joe," he noticed "that something was wrong with her" and that she appeared to be upset.

After receiving the letters from Campos, the District Attorney's Office forwarded the letters to the police, and the police began investigating A.L.'s living situation. The police later discovered that A.L. lived with several other individuals in a house in Bee County, Texas. Among those living with A.L. was S.S., a girl whom A.L. refers to as her sister even though the girls are not related. S.S. testified that she was fourteen years old when she first began dating Jasso in May 2004. Jasso was twenty-two years old at the time he and S.S. began their relationship. S.S. had recently attempted to commit suicide by ingesting numerous medications found in the house, and she admitted that she had low self-esteem and enjoyed smoking marihuana. Jasso provided S.S. with marihuana regularly, and the two began having sexual intercourse shortly after meeting one another in a park. S.S. and Jasso admitted at trial that Jasso penetrated S.S.'s sexual organ with his fingers and penis two or three times each day that they were dating.

S.S. noted that she had problems with her mother; that her mother had "stopped paying attention to [her]"; and that her mother, D.S., did not initially approve of her dating Jasso. Despite D.S.'s disapproval of Jasso, he regularly stayed overnight with S.S. and woke in the morning to make A.L. breakfast. S.S. slept in very late each day, not waking until 3:00 or 4:00 in the afternoon. S.S. also recalled that A.L. would often accompany S.S. and Jasso when they would run errands for S.S.'s mother. S.S.

admitted to smoking marihuana with Jasso while in front of A.L. and that she and Jasso would buy A.L. candy and make her promise to keep S.S. and Jasso's smoking habits a secret. S.S. testified that A.L. and Jasso "always played together"; however, S.S. testified that shortly after she and Jasso broke up, A.L. told her mother that Jasso had molested her. S.S. noticed that A.L. would masturbate when her mother was asleep and that she would play "dirty" with her dolls.[3] S.S. recounted that her relationship with Jasso ended when he began dating S.K., a girl who was several years younger than S.S. S.S. stated that at the time A.L. described the alleged molestation incident to Campos in September 2008, S.S. was dating Joe Richard Estrada and that A.L. was not living with them.

D.S., S.S.'s mother and the foster mother of A.L., testified that she was aware of Jasso sneaking into the house to have sex with S.S. and that she allowed it because she "didn't want to lose [S.S. after her suicide attempt] so I just let her do it." D.S. stated that A.L. always slept in D.S.'s bedroom and that she did not suspect that anything had happened to A.L. until A.L. made her outcry. D.S. recalled that A.L. first told her about the molestation incident after S.S. had told A.L. that she had seen Jasso at the jail. A.L. told D.S. that she did not say anything about the incident for several years because Jasso had threatened to hurt A.L. or her family if she said anything. D.S. then testified to the following:

> After [S.S.] had said that she seen [sic] Joe [at the jail], a few days later [A.L.] said that when she was living in Navy housing Joe Jasso had touched her or touched her private area. She said that he made her breakfast and took her to the garage and told her to lay [sic] down and

---

[3] S.S. explained that playing "dirty" with the dolls meant getting "them naked, and there were times when she [A.L.] would put their heads between their legs . . . [b]etween—the male doll's head between the girl's legs."

4

take her pants down. Then he started touching her around her vagina area. Another time she said that he put his fingers inside her vagina.

After telling D.S. about the incident, A.L. became very afraid. A.L. did not want to go to the bathroom by herself or sleep by herself. She also began to have nightmares about Jasso. D.S. stated that she was very upset about the incident but that she did not have an opportunity to file a complaint with police before Campos did.

S.K., a young girl who also had previously attempted to commit suicide, testified that she and Jasso began dating when she was thirteen years old and was in the seventh grade. Their relationship began shortly after Jasso left S.S. S.K. acknowledged that she and Jasso drank alcohol and smoked marihuana together and that Jasso would provide her with the alcohol and marihuana. S.K. and Jasso dated for approximately two months and had vaginal and/or oral sex between two and four times a day. S.K. noted that Jasso penetrated her sexual organ with his fingers and penis when she was thirteen years old.

Carol Anne McLaughlin, a forensic nurse with the Driscoll Children's Hospital, examined A.L. after A.L. made her outcry. McLaughlin testified that A.L. told her the following during their interview:

> The history that I received from [A.L.] stated *whenever we were at Capeheart* that was when it happened. Those are her words. Then she stated—and these are her words, not mine—*my mom was asleep. I was getting up and he, Joe, made me pancakes.*
>
> . . . .
>
> *He took me to the garage and then he pulled my pants down. I told him no. He wouldn't listen. He started playing with—he started rubbing me on my middle*, and she indicated her female sexual organ by pointing. *He*

5

*sticked [sic] his fingers inside me. That's when I yelled ow [sic]. He told me to shut up or he would hit me. He did this a lot of times.*

(Emphasis in original). McLaughlin noted that A.L. appeared to be truthful and acted "very age appropriate." A.L. "looked [McLaughlin] in the eye. She [A.L.] didn't look at the floor. She didn't look past [McLaughlin], and she talked well with [McLaughlin]." McLaughlin then conducted an examination of A.L.'s body and found no trauma. However, McLaughlin noted that the area surrounding the female sexual organ is membrane that heals very quickly and that the incident had occurred about four years prior to her meeting with A.L.

Steve Liman, an investigator with the Bee County Sheriff's Office, testified that he received Campos's letters that were forwarded along by the District Attorney's Office. After receiving the letters, Liman visited Campos and took a statement from him. Liman also spoke to D.S. about A.L.'s outcry. Liman acknowledged that there were two individuals involved in this case that are named "Joe Richard." Liman determined that Jasso is the "Joe Richard" who dated S.S. and lived at the Capeheart house when the alleged incidents took place and that Estrada is S.S.'s current boyfriend. Estrada was ruled out as the "Joe Richard" who allegedly molested A.L. because during 2004, when the alleged incidents took place, Estrada was incarcerated. Because of Estrada's incarceration at the time of the alleged incidents, Liman concluded that Jasso was the perpetrator of these crimes. Liman also interviewed S.S. and S.K., both of whom admitted to having sexual intercourse with Jasso. These admissions led to additional charges filed against Jasso.

Liman later recounted the arrest of Jasso for the alleged crimes. Liman discovered that Jasso fled Texas shortly after finding out that he had been indicted.

6

Jasso was eventually apprehended in Nebraska for stealing liquor from a grocery store, and he was extradited to Texas. During an interview with Liman, Jasso admitted to having sexual intercourse with S.S. but denied molesting A.L. Liman also testified that he was present during A.L.'s interview with McLaughlin. He recalled that A.L. "was worried or seemed worried that she was going to have to confront Mr. Jasso. . . . She didn't want to see him. . . . Because I got the impression she is afraid of him from the threats he made."

A.L., nine years old at the time of trial, testified that she lived in a house located in the Capeheart subdivision with several people, including D.S., S.S., and, for a time, Jasso. A.L. noted that she would wake up early in the morning, while D.S. was still asleep. A.L. recalled that at the time of the incidents, she usually went into the living room to watch cartoons when she awoke. A.L. noted that Jasso would awake at about the same time as she and would go to the restroom. He would then call for her to follow him, and he would make her pancakes for breakfast. A.L. remembered that after breakfast, Jasso would take her into the garage and "pull up [her] nightgown . . . take down [her] underwears [sic]" and then "lay [her] down" on the sofa in the garage. Jasso would then "start rubbing" A.L. with his fingers on the outside of A.L.'s sexual organ. A.L. then testified that Jasso stuck his finger inside her sexual organ one time, which caused her to scream. When A.L. screamed, Jasso put his hand over A.L.'s mouth and told her to shut up. A.L. later noted that Jasso took her into the garage and molested her "more than once" and that he stuck his finger inside her "[p]robably two or three [times]." A.L. testified that Jasso threatened her and told her that "he would kill my family and my sister and me" if she told anyone about what was happening. A.L.

7

explained that she did not tell anyone about the incident for a long time because she was scared that Jasso would "watch" her and kill her family.

A.L. finally told her family about the incidents when S.S. mentioned that she had seen Jasso in jail. When she first told her story, A.L. identified the perpetrator as "Joe," not "Joe Richard" or "Joe Jasso." On cross-examination, A.L. admitted that she learned the word, "Jasso," from S.S. and D.S. and that she did not know Jasso's full name. However, in open court, A.L. identified Jasso as the man who molested her. A.L. testified that when she told Campos that she was molested by S.S.'s boyfriend, she did not mean Estrada. A.L. further testified that Estrada had not made her breakfast or pancakes, nor had he touched her inappropriately. A.L. stated that Estrada never lived with the family in the Capeheart subdivision; that Jasso did, for a time, live with the family in the Capeheart subdivision; and that the molestation occurred when the family lived in the Capeheart subdivision.

Jasso testified in his own defense. Jasso noted that he was previously employed as a breakfast "chef" at the "My Country Kitchen Restaurant." Jasso denied ever living at the house in the Capeheart subdivision and, instead, noted that he "visited every once in a while." Jasso admitted to having sexual intercourse with S.S. three or four times; however, he denied touching A.L. inappropriately or having sexual intercourse with S.K. Jasso acknowledged that he had been arrested several times before and that he "absconded" shortly after being indicted because he had a "dirty UA" that would have resulted in a probation violation. Jasso testified that he only made A.L. pancakes once and that after making the pancakes, he had to leave quickly because he was running late for work.

On cross-examination, Jasso admitted that he was twenty-two years old when the alleged incidents transpired, even though he told police that he was nineteen. Jasso did not believe that there was anything wrong with having sex with S.S. because he was allegedly told by D.S. that S.S. was seventeen years old. Also on cross-examination, Jasso acknowledged several other inconsistencies between his trial testimony and statements made to police, including the description of incidents where Jasso stole money and property from the families of the girls he was dating and how often he made pancakes for S.S.'s family.[4]

After hearing all of the above-mentioned evidence, the jury convicted Jasso of six counts of aggravated sexual assault, and Jasso pleaded guilty to one count of sexual assault. Jasso received ninety-nine-year sentences for each of the aggravated sexual assault counts and a twenty-year sentence for the sexual assault count. The trial court ordered some of the counts to run concurrently, while other counts were ordered to run consecutively.

On August 25, 2009, Jasso filed a pro se motion for new trial arguing that he did not receive a fair trial and that his trial counsel was ineffective. Because the trial court did not rule on Jasso's pro se motion for new trial, it is deemed overruled by operation of law. *See* TEX. R. APP. P. 21.8(a), (c); *see also State v. Gutierrez*, 143 S.W.3d 829, 831 (Tex. App.–Corpus Christi 2004, no pet.). This appeal ensued.

## II. SUFFICIENCY OF THE EVIDENCE

In his first two issues, Jasso asserts that the evidence supporting his conviction for counts 1 and 4 is legally and factually insufficient because the record demonstrates

---

[4] With respect to the pancakes, Jasso stated at trial that he only made the family pancakes once; however, he told police that he made the family pancakes "a couple times."

9

that in addition to Jasso, S.S. dated another individual with a similar name, Estrada, and that A.L.'s outcry, which was made several years after the alleged incident, actually referenced Estrada rather than Jasso.[5]  In his third and fourth issues, Jasso contends that the evidence supporting his conviction for counts 1 and 4 is legally and factually insufficient because the record does not demonstrate that Jasso used his finger to penetrate A.L.'s sexual organ on two different occasions.

## A.    Applicable Law

The court of criminal appeals has recently held that there is "no meaningful distinction between the *Jackson v. Virginia* legal sufficiency standard and the *Clewis* factual-sufficiency standard" and that the *Jackson* standard "is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks v. State*, No. PD-0210-09, 2010 Tex. Crim. App. LEXIS 1240, at \*\*25-26, \*57 (Tex. Crim. App. Oct. 6, 2010) (plurality opinion).  Accordingly, we review Jasso's claims of evidentiary sufficiency under "a rigorous and proper application" of the *Jackson* standard of review.  *Id.* at \*37, \*57.

Under the *Jackson* standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Brooks*, 2010 Tex. Crim. App. LEXIS 1240, at \*14 (characterizing the *Jackson* standard as:  "Considering all of the evidence in the

---

[5] On appeal, Jasso does not challenge the sufficiency of the evidence pertaining to his convictions for the aggravated sexual assault of S.K.—counts 7, 8, 9, and 10—or for the sexual assault of S.S.—count 11.

light most favorable to the verdict, was a jury rationally justified in finding guilt beyond a reasonable doubt"). "[T]he fact[-]finder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." *Jackson*, 443 U.S. at 319 (emphasis in original); *see* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979) ("The jury, in all cases is the exclusive judge of facts proved and the weight to be given to the testimony . . . ."); *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000) ("The jury is the exclusive judge of the credibility of witnesses and of the weight to be given testimony, and it is also the exclusive province of the jury to reconcile conflicts in the evidence.").

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000); *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd). Under a hypothetically correct jury charge, the State was required to prove beyond a reasonable doubt that Jasso (1) intentionally or knowingly (2) "cause[d] the penetration of the anus or sexual organ of a child by any means."[6] TEX. PENAL CODE ANN. § 22.021(a)(2)(B)(i). "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a) (Vernon 2003). "A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b). Intent may "be inferred

---

[6] A "child" is defined as "a person younger than 17 years of age." TEX. PENAL CODE ANN. §§ 22.011(c), 22.021(b)(1) (Vernon Supp. 2010). Count 1 of the indictment states that Jasso used his finger to penetrate A.L.'s sexual organ on or about May 16, 2004, and count 4 of the indictment alleges the same offense occurring on or about May 18, 2004.

from circumstantial evidence[,] such as acts, words, and the conduct of the appellant." *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); *see Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002) (stating that a fact-finder may infer both knowledge and intent from the defendant's acts, words, or conduct and from the nature of the wounds inflicted on the victim); *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991); *Ledesma v. State*, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984) (noting that the requisite culpable mental state may be inferred from the surrounding circumstances).

The State is not required to present direct evidence to establish guilt. *See Guevara*, 152 S.W.3d at 49. "Circumstantial evidence is as probative as direct evidence in establishing the guilt of the actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see Guevara*, 152 S.W.3d at 49. The law does not require that each fact "point directly and independently to the guilt of the appellant, as long as the cumulative effect of all the incriminating facts is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13; *see Guevara*, 152 S.W.3d at 49.

**B.     Identity**

In his first two issues, Jasso complains that the evidence is insufficient to support the jury's finding that he was the perpetrator of the alleged offenses. Essentially, Jasso challenges the identity element of the aggravated sexual assault offenses charged in counts 1 and 4. The identity of a perpetrator in a sexual assault case may be proven by either direct or circumstantial evidence. *See Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986); *Roberson v. State*, 16 S.W.3d 156, 157 (Tex. App.–Austin 2000, pet

ref'd); *Couchman v. State*, 3 S.W.3d 155, 162 (Tex. App.–Fort Worth 1999, pet ref'd); *see also Ficarro v. State*, No. 13-03-00439-CR, 2007 Tex. App. LEXIS 3166, at *11 (Tex. App.–Corpus Christi Apr. 26, 2007, pet. ref'd) (mem. op., not designated for publication).

Here, Campos, D.S., and McLaughlin testified that A.L. identified the individual who molested her as "Joe" and that the incidents transpired during the summer of 2004. At that time, Jasso was living in, or, at least, was a frequent visitor to, the same household as S.S., A.L., and D.S. S.S. did not begin to date Estrada until several years after the incident transpired, and Detective Liman testified that Estrada was incarcerated in 2004, meaning Estrada could not have committed the alleged offenses. Furthermore, A.L., in her outcry statement, noted that "Joe" made her pancakes and then proceeded to molest her in the garage. Jasso testified that he was a breakfast "chef" and that he made A.L. and the rest of the family pancakes on one occasion, even though he expressed to police shortly after being extradited back to Texas that he had made pancakes for the family several times. Moreover, and perhaps most importantly, A.L. testified at trial that Estrada was not the individual who molested her, and she identified Jasso in open court as the perpetrator.

Nevertheless, Jasso asserts that the evidence is insufficient to support the jury's conclusion that he was the perpetrator because A.L.'s outcry statements were made in the present tense, suggesting that the offenses did not occur until 2007, when Estrada was S.S.'s boyfriend.[7] Jasso also argues that A.L. was supplied the name, "Jasso," by

---

[7] A.L. testified that the perpetrator of the offenses made her pancakes for breakfast before he would molest her, and A.L. testified that Estrada never made her pancakes or breakfast; thus, a rational fact-finder could conclude that the alleged offenses were not committed in 2007, nor by the other "Joe Richard" in this case—Estrada. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Brooks v.*

13

S.S. and D.S. and that neither S.S. nor D.S. believed A.L. at first. Jasso's arguments touch on the weight of the evidence and the credibility of the witnesses, especially A.L. Such determinations are solely within the province of the jury, and we must defer to the jury's resolution of the inconsistent testimony. *See Jackson*, 443 U.S. at 318-19; *Wesbrook*, 29 S.W.3d at 111; *see also Render v. State*, 316 S.W.3d 846, 859 (Tex. App.–Dallas 2010, pet. ref'd) ("An appellate court must give deference to a jury's decision regarding what weight to give contradictory testimonial evidence because the decision is most likely based on an evaluation of credibility and demeanor, which the jury is in a better position to judge.") (citing *Lancon v. State*, 253 S.W.3d 699, 706 (Tex. Crim. App. 2008)). Moreover, it was not incumbent upon the State to exclude "every reasonable hypothesis other than guilt" for the evidence to be considered sufficient. *See Geesa v. State*, 820 S.W.2d 154, 157-61 (Tex. Crim. App. 1991), *overruled on other grounds by Paulson v. State*, 28 S.W.3d 570, 571 (Tex. Crim. App. 2000); *see also Lopez v. State*, 267 S.W.3d 85, 97-98 (Tex. App.–Corpus Christi 2008, no pet.) (citing *Harris v. State*, 133 S.W.3d 760, 763-65 (Tex. App.–Texarkana 2004, pet. ref'd); *Richardson v. State*, 973 S.W.2d 384, 387 (Tex. App.–Dallas 1998, no pet.) ("[T]he mere existence of an alternative reasonable hypothesis does not render the evidence . . . insufficient. . . . [E]ven when an appellant identifies an alternative reasonable hypothesis raised by the evidence, the standard of review remains the same."); *Orona v. State*, 836 S.W.2d 319, 322 (Tex. App.–Austin 1992, no pet.)).

Therefore, viewing all of the evidence in the light most favorable to the prosecution, we conclude that the jury was rationally justified in determining that Jasso

---

*State*, No. PD-0210-09, 2010 Tex. Crim. App. LEXIS 1240, at *14 (Tex. Crim. App. Oct. 6, 2010) (plurality opinion).

was the perpetrator of the alleged offenses against A.L. beyond a reasonable doubt. *See Jackson*, 443 U.S.at 319; *Earls*, 707 S.W.2d at 85; *Roberson*, 16 S.W.3d at 157; *Couchman*, 3 S.W.3d at 162; *see also Brooks*, 2010 Tex. Crim. App. LEXIS 1240, at *14; *Ficarro*, 2007 Tex. App. LEXIS 3166, at *11. Accordingly, we overrule Jasso's first and second issues.

## C. Evidence of Digital Penetration

By his third and fourth issues, Jasso argues that the evidence is insufficient to support his convictions as to both counts 1 and 4. Count 1 of the indictment provided that, on or about May 16, 2004, Jasso intentionally or knowingly caused the penetration of A.L.'s sexual organ with his finger, and he threatened or placed A.L. "in fear that death would be imminently inflicted on [A.L.] or [D.S.]." *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i), (2)(A)(ii). Count 4 of the indictment mirrored count 1 except that it alleged that the offense occurred on or about May 18, 2004. *See id.* The State essentially alleged in the indictment that Jasso penetrated A.L.'s sexual organ and threatened her at least on two occasions. On appeal, Jasso contends that the evidence demonstrates that A.L. was only penetrated once; he does not challenge the second portion of each count pertaining to the threats. Jasso also suggests that the "rubbing" of A.L.'s sexual organ that allegedly occurred several times really amounted to indecency with a child, an offense which was not alleged in the indictment. *See id.* § 21.11(a) (Vernon Supp. 2010).[8]

In the instant case, A.L. first testified that Jasso penetrated her sexual organ only one time. However, she later clarified that the penetration occurred "more than once."

---

[8] Section 21.11, entitled "Indecency With a Child" provides that: "[a] person commits an offense if, with a child younger than 17 years of age . . . the person . . . [e]ngages in sexual contact with the child or causes the child to engage in sexual contact." TEX. PENAL CODE ANN. § 21.11(a) (Vernon Supp. 2010).

15

When asked to describe the incidents for a third time, A.L. stated that the penetration took place "probably two or three times." In addition, McLaughlin testified earlier that A.L. told her that: "[Jasso] sticked [sic] his fingers inside me. That's when I yelled ow [sic]. He told me to shut up or he would hit me. *He did this a lot of times.*" By stating that Jasso "did this a lot of times," A.L. confirmed to McLaughlin that Jasso penetrated her sexual organ with his finger many times.

We first note that the testimony of a child victim typically is sufficient to support a conviction for aggravated sexual assault. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07 (Vernon 2005); *Perez v. State*, 113 S.W.3d 819, 838 (Tex. App.–Austin 2003, pet. ref'd), *overruled in part on other grounds by Taylor v. State*, 268 S.W.3d 571 (Tex. Crim. App. 2008); *Karnes v. State*, 873 S.W.2d 92, 96 (Tex. App.–Dallas 1994, no pet.) ("[T]he testimony of a sexual assault victim alone is sufficient evidence of penetration to support a conviction, even if the victim is a child."); *see also Fernandez v. State*, No. 13-09-168-CR, 2010 Tex. App. LEXIS 6741, at *11 (Tex. App.–Corpus Christi Aug. 19, 2010, no pet.) (mem. op., not designated for publication). Further, courts give wide latitude to the testimony given by child victims of sexual abuse. *See Villalon v. State*, 791 S.W.2d 130, 134 (Tex. Crim. App. 1990) (en banc). "The victim's description of what happened to [her] need not be precise, and [she] is not expected to express [herself] at the same level of sophistication as an adult." *Ozuna v. State*, 199 S.W.3d 601, 606 (Tex. App.–Corpus Christi 2006, no pet.) (citing *Villalon*, 791 S.W.2d at 134).

Here, there is only one instance where A.L. alleged that Jasso penetrated her sexual organ on one occasion. A.L. made two other statements later in her testimony, and she conveyed to McLaughlin that Jasso penetrated her sexual organ several times.

16

Regardless, this apparent inconsistency in A.L.'s testimony was within the province of the jury to resolve, and, once again, we are to defer to the jury's resolution of the inconsistency. *See Jackson*, 443 U.S. at 318-19; *Lancon*, 253 S.W.3d at 706; *Wesbrook*, 29 S.W.3d at 111; *see also Render*, 316 S.W.3d at 859. In convicting Jasso of both counts 1 and 4, the jury clearly accorded more weigh to A.L.'s later testimony and statements to McLaughlin that Jasso penetrated her sexual organ on a number of occasions rather than her apparently imprecise initial statement that the penetration only occurred once. *See Villalon*, 791 S.W.2d at 134; *see also Ozuna*, 199 S.W.3d at 606.

Viewing all of the evidence in the light most favorable to the prosecution, we conclude that the jury was rationally justified in concluding that Jasso penetrated A.L.'s sexual organ using his fingers on more than one occasion. *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i); *Jackson*, 443 U.S.at 319; *Perez*, 113 S.W.3d at 838; *see also Brooks*, 2010 Tex. Crim. App. LEXIS 1240, at *14; *Fernandez*, 2010 Tex. App. LEXIS 6741, at *11. Moreover, because we have concluded that the evidence supporting Jasso's convictions for the aggravated sexual assault of A.L. is sufficient, and because "[s]exual contact or exposure that occurs in the course of an act of sexual penetration is subsumed in the completed act," we need not address his contention regarding indecency with a child. *Soto v. State*, 267 S.W.3d 327, 343 (Tex. App.–Corpus Christi 2008, no pet.) (citing *Patterson v. State*, 152 S.W.3d 88, 92 (Tex. Crim. App. 2004)); *see* TEX. R. APP. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal."). Accordingly, we overrule Jasso's third and fourth issues.

17

### III.  JASSO'S PUNISHMENT AND THE EIGHTH AMENDMENT OF THE UNITED STATES CONSTITUTION

By his fifth issue, Jasso asserts that the cumulation of his sentences violates the Eighth Amendment's ban of cruel and unusual punishments.  *See* U.S. CONST. amend. VIII.  He also argues that the punishment was grossly disproportionate to the seriousness of the offenses.  The Eighth Amendment of the United States Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted."  *Id.*; *see Robinson v. California*, 370 U.S. 660, 675 (1962).  The Eighth Amendment is applicable to punishments imposed by state courts through the Due Process Clause of the Fourteenth Amendment.  *Robinson*, 370 U.S. at 675; *see* U.S. CONST. amend. XIV.

In the instant case, Jasso did not object to his sentence in the trial court, and he did not file any post-trial motions or objections complaining that his sentence was either disproportionate to the seriousness of the offenses, or complaining about the disparity, cruelty, unusualness, or excessiveness of the sentence.  To preserve error for appellate review, a party must present a timely objection to the trial court, state the specific grounds for the objection, and obtain a ruling.  TEX. R. APP. P. 33.1(a); *Dixon v. State*, 2 S.W.3d 263, 265 (Tex. Crim. App. 1998).  The failure to specifically object to an alleged disproportionate sentence in the trial court or in a post-trial motion waives any error for our review.  *Jacoby v. State*, 227 S.W.3d 128, 130 (Tex. App.–Houston [1st Dist.] 2006, pet. ref'd); *see Nicholas v. State*, 56 S.W.3d 760, 768 (Tex. App.–Houston [14th Dist.] 2001, pet. ref'd) (holding that a failure to complain to the trial court about a consecutive sentence waives error); *Solis v. State*, 945 S.W.2d 300, 301-02 (Tex. App.–Houston [1st Dist.] 1997, pet. ref'd) (holding that a claim of a grossly disproportionate sentence

violative of the Eighth Amendment was forfeited by failing to object in the trial court); *see also Trevino v. State*, Nos. 13-07-737-CR & 13-07-738-CR, 2008 Tex. App. LEXIS 5123, at *3 (Tex. App.–Corpus Christi July 3, 2008, pet. ref'd) (mem. op., not designated for publication). Because he did not object to the alleged disproportionality of his sentence in the trial court or raise the issue in a post-trial motion, we conclude that Jasso has not preserved this issue for appellate review. *See* TEX. R. APP. P. 33.1(a); *see also Jacoby*, 227 S.W.3d at 130.

Assuming, however, that Jasso had preserved the issue for appellate review, we conclude that his consecutive sentence did not violate the Eighth Amendment and was not disproportionate to the serious of the offenses. Jasso argues that his sentence is grossly disproportionate and constitutes cruel and unusual punishment because, by stacking his sentences, the trial court imposed "a term of over 300 years." Jasso asserts that this punishment amounts to "[l]ife without parole" and, therefore, "is not within the punishment range for these types of offenses."

The cumulation of sentences does not constitute cruel and unusual punishment. *See Stevens v. State*, 667 S.W.2d 534, 538 (Tex. Crim. App. 1984); *Quintana v. State*, 777 S.W.2d 474, 480 (Tex. App.–Corpus Christi 1989, pet. ref'd); *see also Rueda v. State*, No. 13-07-517-CR, 2008 Tex. App. LEXIS 5121, at *5 (Tex. App.–Corpus Christi July 3, 2008, pet. ref'd) (mem. op., not designated for publication). "Normally, the trial judge has absolute discretion to cumulate sentences." *Smith v. State*, 575 S.W.2d 41, 41 (Tex. Crim. App. 1979); *see Green v. State*, 706 S.W.2d 653, 656 (Tex. Crim. App. 1986); *Quintana*, 777 S.W.2d at 480. A trial court has the discretion to either order a defendant's sentence to begin when his previous sentence ends, or to allow the

19

defendant's sentence to run concurrently with his previous sentence. *See* TEX. CODE CRIM. PROC. ANN. art. 42.08[9]; *Quintana*, 777 S.W.2d at 480. Further, a criminal defendant does not have a right to a concurrent sentence. *Carney v. State*, 573 S.W.2d 24, 27 (Tex. Crim. App. 1978); *Quintana*, 777 S.W.2d at 480.

Jasso was convicted of six counts of aggravated sexual assault, a first-degree felony, and one count of sexual assault, a second-degree felony. *See* TEX. PENAL CODE ANN. §§ 22.011(a)(2), (f), 22.021(a)(2)(B), (e). The punishment range for a first-degree felony is "imprisonment . . . for life or for any term not more than 99 years or less than 5 years," *id.* § 12.32(a) (Vernon Supp. 2010), and the range for a second-degree felony is "imprisonment . . . for any term of not more than 20 years or less than 2 years." *Id.* § 12.33(a) (Vernon Supp. 2010). Here, the trial court sentenced Jasso to ninety-nine years' imprisonment for each first-degree felony and twenty years' imprisonment for the second-degree felony. Further, to the extent that Jasso argues that the cumulation of his sentences amounts to a life sentence, such sentence is within the punishment range for a first-degree felony, and as previously stated, Jasso was convicted of six first-degree felonies. *See id.* § 12.32(a). Punishment assessed within the statutory limits is generally not cruel and unusual punishment. *See Harris v. State*, 656 S.W.2d 481, 486 (Tex. Crim. App. 1983) (holding that a punishment that falls within the limits prescribed

---

[9] The Texas Code of Criminal Procedure provides:

> When the same defendant has been convicted in two or more cases, judgment and sentence shall be pronounced in each case in the same manner as if there had been but one conviction. . . . [I]n the discretion of the court the judgment in the second and subsequent convictions may either be that the sentence imposed or suspended shall begin when the judgment and the sentence in the preceding conviction has ceased to operate, or that the sentence imposed or suspended shall run concurrently with the other case or cases, and sentence and execution shall be accordingly. . . .

TEX. CODE CRIM. PROC. ANN. art. 42.08(a) (Vernon 2006).

by a valid statute is not excessive, nor cruel or unusual)[10]; *Samuel v. State*, 477 S.W.2d 611, 614 (Tex. Crim. App. 1972); *Swinney v. State*, 828 S.W.2d 254, 259 (Tex. App.– Houston [1st Dist.] 1992, no pet.); *see also Trevino*, 2008 Tex. App. LEXIS 5123, at *4.

Jasso also argues that his sentences are disproportionate and essentially asks this Court to apply the *Solem* proportionate analysis test to his sentence. *See Solem v. Helm*, 463 U.S. 277, 290-92 (1983). This Court has previously recognized that "the viability and mode of application of proportionate analysis . . . has been questioned since the Supreme Court's decision in *Harmelin v. Michigan*, 501 U.S. 957 (1991)." *Trevino v. State*, 174 S.W.3d 925, 928 (Tex. App.–Corpus Christi 2005, pet. ref'd) (citing *McGruder v. Puckett*, 954 F.2d 313, 315-16 (5th Cir. 1992) (discussing the various opinions issued in *Harmelin* and their impact on the *Solem* decision)); *see Sullivan v. State*, 975 S.W.2d 755, 757-58 (Tex. App.–Corpus Christi 1998, no pet.) (discussing the implications of the *Harmelin* opinion and reviewing the proportionality of appellant's sentence under the *Solem* and *McGruder* tests). Assuming, arguendo, the viability of proportionality review, we will apply both the *Solem* and *McGruder* tests to the facts of this case. *See Sullivan*, 975 S.W.2d at 757-58; *see also Trevino*, 2008 Tex. App. LEXIS 5123, at *5. In both *Solem* and *McGruder*, we look first at the gravity of the offense and the harshness of the penalty. *Solem*, 463 U.S. at 290-91; *McGruder*, 954 F.2d at 316.

## A.    Gravity of the Offense

Jasso asserts that his punishment is disproportionate to the gravity of the offense because he engaged in "consensual sex with teenage girls, self-described by one as 'wild'" and "was never accused of physically abusing, dominating or intimidating [S.K.] or

---

[10] On appeal, Jasso does not challenge the validity of sections 12.32 and 12.33 of the penal code—the provisions prescribing the punishment range for first and second-degree felonies. *See* TEX. PENAL CODE ANN. §§ 12.32, 12.33 (Vernon Supp. 2010).

[S.S.]." Jasso's sexual assault convictions are derived from his sexual relationships with four-year-old, A.L., thirteen-year-old, S.K., and fourteen-year-old, S.S. In Texas, "a child under fourteen cannot legally consent to sex." *May v. State*, 919 S.W.2d 422, 424 (Tex. Crim. App. 1996). However, affirmative defenses to sexual assault are available if the child is at least fourteen, such as when the accused is no more than three years older than the child, or when the accused is the child's spouse. *See* TEX. PENAL CODE ANN. § 22.011(e). In the present case, no such defenses were asserted. Thus, Jasso's assertion that his sexual relationships with A.L., S.K., or S.S. were consensual is unfounded. *See id.*; *see also May*, 919 S.W.2d at 424.

As previously discussed, the evidence at trial was sufficient to prove that, on more than one occasion, Jasso penetrated A.L.'s sexual organ with his fingers. Further, Jasso does not argue that the evidence is insufficient to support his four convictions for the aggravated sexual assault of S.K., and Jasso pleaded guilty to sexually assaulting S.S. Neither aggravated sexual assault nor sexual assault requires physical abuse, domination, or intimidation. *See* TEX. PENAL CODE ANN. §§ 22.011(a)(2), 22.021(a)(2)(B). Moreover, we judge the gravity of the offense in light of the harm caused or threatened to society and the offender's culpability. *Moore v. State*, 54 S.W.3d 529, 542 (Tex. App.–Fort Worth 2001, pet. ref'd) (citing *Solem*, 463 U.S. at 291-92). Jasso's six aggravated sexual assault convictions and one sexual assault conviction were based on evidence that he preyed on young, under-aged girls and engaged in sexual acts with these girls on numerous occasions within approximately a one to two month time period. Based on the foregoing, we conclude that the gravity of the offense weighs in favor of a finding that the punishment was not excessive.

**B.    Harshness of the Penalty**

When conducting an Eighth Amendment proportionality analysis, we may consider the sentence imposed in light of the accused's prior offenses. *Winchester v. State*, 246 S.W.3d 386, 390 (Tex. App.–Amarillo 2008, pet. ref'd); *Culton v. State*, 95 S.W.3d 401, 403 (Tex. App.–Houston [1st Dist.] 2002, pet. ref'd). At the punishment phase of trial, the State presented evidence that Jasso was previously convicted of eight counts of forgery, a state-jail felony. *See* TEX. PENAL CODE ANN. § 32.23(b), (d) (Vernon Supp. 2010). In light of the seriousness of Jasso's six aggravated sexual assault and one sexual assault conviction, as well as the evidence of his eight prior forgery offenses, we cannot say that his "life sentence" is excessive. We therefore conclude that his punishment is not grossly disproportionate to the offense for which he was convicted.

Moreover, because there is no evidence in the appellate record of the sentences imposed for other similar crimes in Texas or for the same crimes in other jurisdictions, we cannot perform a comparative evaluation using the remaining *Solem* factors. *See Solem*, 463 U.S. at 292; *see also Sullivan*, 975 S.W.2d at 757-58. Therefore, we conclude that Jasso's sentence is neither grossly disproportionate nor cruel and unusual. Accordingly, Jasso's fifth is overruled.

**IV.    THE TRIAL COURT'S CUMULATION OF THE SENTENCES WITH A PRIOR SENTENCE**

By his sixth issue, Jasso asserts that the trial court abused its discretion by ordering his sentence in this case to run consecutive to a prior sentence received in trial court cause number B-04-2061-0-CR-B for eight counts of forgery. Specifically, Jasso

23

contends that the State failed to affirmatively prove that Jasso was the individual sentenced on the forgery counts.

At the time of sentencing, the record must contain at least "some evidence" linking the defendant to the prior conviction. *Miller v. State*, 33 S.W.3d 257, 261 (Tex. Crim. App. 2000). The burden is on the State to present this evidence, and the defendant has no obligation to prove he has no prior convictions. *Turner v. State*, 733 S.W.2d 218, 223 (Tex. Crim. App. 1987). During the punishment phase of the trial, the State introduced a copy of Jasso's conviction for eight counts of forgery in trial court cause number B-04-2061-0-CR-B. The copy of the judgment was admitted without objection; the State did not offer testimony that Jasso is the same defendant convicted in trial court cause number B-04-2061-0-CR-B. However, before the trial court ordered trial court cause number B-09-2120-0-CR-B to run consecutive to trial court cause number B-04-2061-0-CR-B, the following exchange occurred:

| | |
|---|---|
| The Court: | All right. . . . I think the State had filed a motion to have the sentence [in trial court cause number B-09-2120-0-CR-B] accumulated. |
| [State]: | Yes, your Honor, we did. |
| The Court: | I'm going to review your motion. |
| [State]: | Yes, ma'am. |
| The Court: | What is on 04-2061? Is that the— |
| [State]: | That's the state jail felony, your Honor. May I approach, your Honor? |
| The Court: | Is he serving time on that now? |
| [State]: | He was revoked on both of those. |
| The Court: | I know, but are you done? Are you done with those? |

24

| [State]: | He has been getting credit for time, Judge. It was revoked. |
|---|---|
| [Defense Counsel]: | He'll probably discharge that this month or next month. |

In *Miller*, the Texas Court of Criminal Appeals held that admissions by the defendant's lawyer that the defendant "was currently serving 30 years for two prior convictions" constituted admissions that the defendant "indeed had the two prior convictions" set out in the State's motion to cumulate. *See Miller*, 33 S.W.3d at 262. Similarly, in the present case, defense counsel's admission that Jasso would be discharging the forgery sentence imposed in trial court cause number B-04-2061-0-CR-B constitutes an admission that Jasso is the defendant named in the present case. *See id.* Thus, we conclude the trial court did not abuse its discretion because there was sufficient evidence before it to properly order the sentences to run consecutively. We overrule Jasso's sixth issue.

## V. CONCLUSION

Having overruled all of Jasso's issues on appeal, we affirm the judgment of the trial court.

_____
ROGELIO VALDEZ
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
6th day of January, 2011.

25